UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETS

| | |
|---|---|
| _____ ) | |
| SHERRY ARGOV, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| SIMON & SCHUSTER, INC., ) | |
| SIMON & SCHUSTER DIGITAL SALES INC., ) | |
| ADAMS MEDIA, PROQUEST LLC, and ) CIVIL ACTION NO. _____ | |
| DOES 1 through 10, Inclusive, ) | |
| ) | |
| Defendants. ) JURY TRIAL DEMANDED | |
| ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, SHERRY ARGOV ("Argov"), hereby alleges:

### NATURE OF THE ACTION

1.    Plaintiff Sherry Argov is a book author who entered into agreements with

Defendants, Simon & Schuster, Inc., Simon & Schuster Digital Sales Inc., and Adams

Media, their predecessor (collectively "Defendants"),  to publish, sell and distribute a

digital eBook and a trade paperback book  (collectively "Publishing Agreements").

2.     The Publishing Agreements between Argov and Defendants require

Defendants to pay royalties to Argov upon the sale of each eBook or paperback book on a

"per-copy-sold" basis.  However, the Defendants have violated the terms of the

Publishing Agreements by including Argov's eBook in "subscription" programs,

"eLending" programs and other all-inclusive, bulk marketing platforms, such as those run

by Defendant Proquest LLC.  These eBook programs offer millions of eBooks to

consumers for a flat fee, or for no fee at all.  For purposes of calculating the royalties, the

1

Defendants ascribed a zero-value or a low value for eBooks viewed in these "subscription" platforms. Argov's Publishing Agreements expressly preclude distribution of her book in these platforms, because the Defendants do not pay her royalties from these programs on a "per copy" book sold basis.

3. Defendants knew, and recklessly disregarded the essential terms of the Publishing Agreements. Their acts significantly reduced Argov's earning capacity, intentionally frustrated her rights under the Publishing Agreements, artificially lowered the number of books sold on her statements, and damaged the commercial value of her copyright.

4. Instead of paying Argov in accordance with the terms of the Publishing Agreement, Defendants exploited rights not granted, then made arbitrary decisions about how (and from what pool of money) it would pay Argov, if anything. Defendants significantly eroded the royalties paid to the Plaintiff, which constitutes a material breach of the Publishing Agreements.

5. Based on the following, Argov asserts causes of action against the Defendants and ProQuest for copyright infringement including secondary copyright infringement, breach of contract including breach of the implied covenant of good faith and fair dealing, and violations of Mass. Gen. Laws Chapter 93A. In addition, Argov seeks appropriate declaratory relief to declare that the Publishing Agreements are terminated, pursuant to the termination remedies available to her as set forth in those agreements.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action based upon federal question jurisdiction under the U.S. Copyright Act.  28 U.S.C. §§ 1331, 1338, and also by diversity of citizenship with the aggregate amount sought in damages exceeding $75,000.  28 U.S. Code § 1332.

7.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2). Defendant Adams Media, a division of the co-defendants Simon & Schuster located in Avon, Massachusetts, has been the publisher of Argov's book since 2001.  Massachusetts is where all Publishing Agreements were negotiated, is the location where the copyright was registered, and is where the acts giving rise to this Complaint occurred.

8.     The Publishing Agreements entered between Argov and Defendants, which are attached hereto as Exhibit A and Exhibit B, expressly provide that the agreement "in all respects concerning its validity, execution, construction, interpretation, enforcement and performance are to be governed according to the laws of the Commonwealth of Massachusetts and The United States of America."

## THE PARTIES

9.     Argov is, and was at all times herein mentioned, a full-time writer and book author who resides in Los Angeles, California.  In 2001, Argov entered into her first Publishing Agreement with Adams Media, located at 57 Littlefield St., Avon, Massachusetts.

10.    Simon & Schuster, Inc. ("Simon & Schuster") is a New York corporation. Simon & Schuster is, and was at all times relevant hereto, engaged in the book publishing industry, with its principal place of business  in New York, New York.

11.     Simon & Schuster Digital Sales Inc. ("Simon & Schuster Digital") is a Delaware corporation, with its principal place of business in New York, New York. Defendants publish over 2,000 titles annually under different imprints, including Adams Media.

12.     Adams Media is a business entity with its principal place of business in Avon, Massachusetts. Adams Media has been engaged in the publishing business in Massachusetts for over thirty years. Adams Media published the Plaintiff's book since its first publication in 2002, and has continued to do so for 17 years.  In 2003, F&W Publications, Inc. acquired Adams Media, and then sold Adams Media to Simon & Schuster and Simon & Schuster Digital in 2016.  Under Simon & Schuster's ownership, Adams Media has continued to operate its publishing business in Avon, Massachusetts, where it has continued to publish Argov's book.

13.     ProQuest LLC is a global for-profit technology company with a principal place of business in Ann Arbor, Michigan, and has offices and sales representatives throughout North America, Asia, Europe, the Middle East, Africa, and Latin America. ProQuest facilitated the unlicensed exploitation and infringement of Argov's eBook outside the scope of the Publishing Agreements.

14.     Plaintiff does not know the true and exact names, identities and capacities of the Defendants named as DOES 1 through 10, inclusive, in this Complaint. Plaintiff will seek leave to amend the Complaint when their exact names, identities and capacities are ascertained, at or before trial. Plaintiff is informed and believes, and thereon alleges, that the DOE Defendants acted in concert with the Defendants, and each of them, and consented to the acts and conduct of Defendants herein alleged. Accordingly, they are

4

jointly and severally liable for said Defendants' actions and omissions, as herein alleged and described.

**FACTUAL BACKGROUND**

15.    On or about October 11, 2001, Argov entered into her first agreement with Adams Media to publish and sell Argov's first book, entitled *Why Men Love Bitches,* ("Book" or "eBook") a humorous book about relationships.

16.    According to Adams Media, Argov's book is the most commercially successful book published by Adams Media and has sold approximately 2,000,000 copies according to Argov's royalty statements.  Following the purchase of Adams Media by Simon & Schuster, Argov's book continued to perform as a bestseller, and currently ranks eighth on the Barnes & Noble Top 100 bestseller list.

17.    In 2014-15, F&W Media (which had purchased Adams Media in 2003), and Argov mutually terminated the 2001 agreement with Adams Media and entered two Publishing Agreements; one for an eBook edition in 2014 which requires Defendants to pay Argov 50% of net eBook receipts from every eBook viewed or downloaded (Exhibit A); and another for a trade paperback edition in 2015 which requires Defendants to pay the Author 10% of the published cover price for every trade paperback sold (Exhibit B).

18.    At all times relevant hereto, Defendants and Argov agreed that her eBook and paperback would be marketed, sold and licensed on an individual "per-copy" basis requiring that every eBook transaction would be royalty-bearing. The parties expressly agreed that Argov's book would be excluded from subscription, e-lending and similar programs that are non-royalty bearing. Paragraph 1, on Page 1 of the eBook contract provides:

**1. Grant and Territory.** Proprietor hereby grants the Publisher an exclusive license to produce, publish and sell the complete printed edition of the Work in full-length verbatim electronic text format, in the English language, throughout the World.

For the avoidance of doubt, the Work shall be excluded from any and all subscription services whether operated by the Publisher of under license with any third party without the express written permission of the Proprietor. A subscription service shall be defined as any lending, borrowing or viewing service that does not sell the Work on a per-copy sold basis.

(See Exhibit A).

19.     By 2014, Argov's book had been a top performing book for Adams Media and F&W Media for over a decade and had demonstrated extraordinary longevity as a bestseller. Both Argov, and the Chief Executive Officer of F&W Media agreed that the success and profitability of the book long-term would depend on their ability to charge the user for every copy viewed, downloaded, or sold.  Argov waived an advance payment in exchange for royalty terms which would guarantee her more compensation on the back end.  It is for this reason that the parties agreed that electronic copies would not be licensed to subscription or lending platforms.

20.     When publishers offer subscription or lending rights, millions of books are made available as part of a bundle (like Netflix) for a flat-fee payment by the consumer who makes payments monthly, yearly or by school semester in exchange for unlimited access to eBooks. Entertainment conglomerates collect millions of dollars in up-front revenues through these eBook subscription programs, while authors and artists get paid very little from subscription services, if anything.

21.     The Publishing Agreements have no exception, calculation, provision, formula or allocation of revenue from subscription or lending distribution channels whatsoever, because the Publishing Agreements expressly provide that all such exploitation shall be excluded.

22.     Pursuant to Par. 5, of the Electronic Rights Agreement, Defendants are contractually required to pay the author as follows:

> **Royalties.** In consideration of the rights granted to the Publisher by the  Proprietor hereunder, the Publisher hereby agrees to pay the Proprietor royalties at  a rate of fifty percent (50%) of the Net Amount Received by the Publisher for all copies sold.

23.      Amazon, Apple, Google and Simon & Schuster's own website list the cover price of Argov's book at $15.99 for the trade paperback and $11.99 for the eBook. Of the $11.99 retail price, eBook retailers keep a percentage of the sale price and the remainder is paid to the Defendants who are supposed to split the net proceeds 50-50 with Argov, on a semi-annual basis.

24.     Defendants violated the contractual obligation to pay a 50% royalty on net proceeds to Argov on a "per copy" basis, when it permitted several technology companies to reproduce and distribute Argov's eBook in a non-royalty bearing manner reflecting an unfair and inaccurate calculation found nowhere in the Publishing Agreements. The effect of this practice was that Argov was not paid for every eBook distributed by these technology companies.

25.     Defendants violated the express terms of the Publishing Agreements and its implied covenant of good faith and fair dealing, by distributing the book through third parties in an unauthorized manner and then failing to account for all digital eBooks distributed on a "per copy" sold basis. Their acts and omissions significantly reduced the

author's earning capacity and artificially lowered the number of books reported on her royalty statements.

26.     On or about April 1, 2017, when F&W Media was sold to Simon & Schuster and assigned it the Publishing Agreements, F&W Media's legal counsel, Karen Renz, notified the legal department of CBS (parent company of Simon & Schuster) that subscription rights and eLending rights were expressly prohibited by the assigned Publishing Agreements, stating in an email the following:

> "Following up on my earlier email about Sherry Argov's Electronic Rights Agreement, I also wanted to note that third parties, such as Overdrive, provide ebooks to lenders, including libraries so they would also be considered Subscription Services under the Electronic Rights Agreement and therefore the Work would be excluded from Overdrive, and similar companies."

27.     The terms of the Electronic Rights Agreement prohibiting subscription and lending platforms, and the email notice reminding Simon & Schuster of this prohibition at the time the agreement was assigned to Simon & Schuster, was a critical reason for Argov granting her assent to the assignment.

28.     Three days later on April 4, 2017, Chris Duffy, the royalties manager of Adams Media (which became a division of Simon & Schuster upon the sale by F&W Media), acknowledged that the Defendants were on notice of these restrictions. Mr. Duffy sent the following email to Argov:

> "This was communicated to the proper parties last Friday. S&S is fully aware of the restriction on any service that does not sell the eBook on a per-copy basis."

**DEFENDANTS' CONTRACTUALVIOLATIONS,
COPYRIGHT INFRINGEMENT, CONCEALMENT OF SAID COPYRIGHT
INFRINGEMENT, AND FAILURE TO WITHDRAW ALL INFRINGING
EXPLOITATION AFTER BEING NOTIFIED BY ARGOV**

29.     Defendants repeatedly and intentionally violated the Publishing

Agreements by distributing the eBook in an unauthorized and wrongful manner.

30.     Beginning in 2019, Argov learned that the Defendants made the Argov

eBook available through ProQuest's and My iLibrary's subscription-based services.

ProQuest and My iLibrary distributed Argov's eBook to private companies, government

agencies, public and high school libraries, and colleges and universities.

31.     According to its website, ProQuest has 40,000 clients and offers 750,000

digital eBooks to these clients. ProQuest offers an inclusive subscription product called

My iLibrary, which provides an entire catalog of streamed videos and eBooks to paid

subscribers at universities and various other businesses internationally.

32.     ProQuest distributed Argov's eBook in its programs, while collecting

subscription fees from students, faculty and members of other companies.

33.     In exchange for the fees collected by ProQuest, My iLibrary advertises the

following features along with the free content to its 40,000 clients:

> **"Always-on access**: 24 hours a day, 7 days a week access to content anywhere."
> **"Use anywhere**: Accommodates both on-site and remote users."
> **"Flexible acquisition models**: 1-UL, 3-UL, PDA or Access Model, most of our
> content is available via perpetual license."
> **"Automated Purchasing**: Simple and efficient approval plans to automate the
> acquisition of content."
> **"No proprietary e-book reader is required.** The My iLibrary platform
> integrates easily."
> **"Tracking is supported on e-book usage activity**."

34.     In exchange for the fees collected by ProQuest, "Academic Complete" gives universities, colleges and private companies the following:

> **"180,000 titles with unlimited, multi-user access.**
> **"Titles from leading publishers."**
> **"DRM-free chapter downloads."**

35.     The purpose of Digital Rights Management ("DRM") is to encrypt every eBook to prevent unauthorized copying and redistribution of digital media. However, ProQuest allows subscribers to download part or all of the content without DRM. The effect of delivering "DRM-free" content is that the download can be re-uploaded, and pirated by individuals or companies due to the lack of encrypted security.

36.     Unlike the music business where music publishers often own the copyrights in the recordings, book authors almost always retain ownership of their copyright. Under the "simple and efficient" subscription packages offered by ProQuest, ProQuest does not review the contract or exercise due diligence when determining whether a copyright owner contractually agreed to allow "DRM free" usage by 40,000 universities, colleges and companies on a perpetual basis, without compensation.

37.      The Defendants recklessly permitted the unauthorized distribution and infringement of Argov's copyright to ProQuest (and others), knowing that a large segment of Argov's audience is comprised of college-aged students.

38.     After being presented with evidence that the Simon & Schuster logo and details were displayed on the eBook being wrongfully distributed by ProQuest, the royalty manager, Chris Duffy, informed Argov via email on June 27, of 2019 that her digital eBook was uploaded to ProQuest's program and was distributed to universities, colleges and businesses immediately after the assignment from F&W Media in 2017.

39.     After Simon & Schuster refused to notify the parties to prevent wrongful

distribution, on July 18, 2019, Argov's counsel sent a cease and desist letter to the Chief

Executive Officer of ProQuest, LLC, and instructed him to contact clients to withdraw

Argov's eBook. ProQuest was also asked to provide an accounting including of the free

"usage" or views it was providing to its 40,000 clients.  Rather than provide the requested

information, ProQuest acted in concert with the Simon & Schuster to conceal the

infringement and the extent of the damages to Argov.

40.     Defendants deviated from the terms of the Publishing Agreements to pay a

50% royalty on "per copy sold" basis. Instead, subscription fees were collected (and not

shared with Argov).  By providing a "zero value" to subscribers, the Defendants violated

the "per copy sold" requirement in the Publishing Agreements.  This enabled Defendants

and its partners, such as ProQuest, to retain 100% of the revenues.

41.     Defendants violated the contractual terms and omitted to report the

number of copies distributed. For six consecutive semi-annual royalty statements,

Defendants failed to account to Argov for the number of free copies on her semi-annual

royalty reports. Although Defendants routinely report the number of free copies of the

paperbacks given away on the royalty statements, Defendants' do not report free digital

eBooks distributed on the statements.

42.     Despite the author's numerous requests, the Defendants refused to inform

her of the number of free eBooks distributed through ProQuest, or to provide the  free

"usage" report despite the fact that ProQuest offers publishers an online portal that allows

access to this free "usage" data.

11

43.     Defendants knew that ProQuest would mass distribute unauthorized copies of her book, and that Argov would not be paid for the value of the views accessed by 40,000 ProQuest clients.

44.     Argov and her legal counsel instructed Simon & Schuster to withdraw the unauthorized distribution from ProQuest and to account for every copy viewed or downloaded.  Simon & Schuster refused.

45.     Even after being notified of the wrongful distribution, and after admitting that it uploaded and authorized Argov's digital eBook to be included in ProQuest's platform, Defendants refused to take reasonable remedial actions to mitigate the ongoing violation of the contract and copyright infringement. The Defendants: (a) refused to disclose clearly their royalty calculation methodology, and to advise or report to Argov about how many times the eBook was viewed or downloaded through ProQuest and its sub-licensees; (b) refused to notify the third party universities, libraries and companies who were mass-distributing Argov's eBook to instruct them to withdraw or to halt the unauthorized distribution and willful violations of Argov's copyright; and, (c) refused to provide Argov with reasonable information about which universities, libraries and companies were still distributing the work in an unlawful manner so her legal counsel could contact these entities  to mitigate their  infringement, which continues unabated.

46.     Simon & Schuster has the authority to supervise the exploitation of the book by its distributors, and a duty to: (a) ensure that its business partners comply with the Publishing Agreements; (b) properly and accurately account for and include a 50% net royalty from the sale or license of every eBook on a "per copy sold" basis.  Simon &

Schuster caused and materially contributed to the infringements on Argov's copyright, and its actions are intentional and willful.

47.     While entering into conspiracies to unreasonably deprive Argov of her rightful share of income, the Defendants conveniently failed to properly account to Argov on her royalty statements or to disclose the number of free or unpaid digital eBooks it distributed in any given royalty period.

48.     Simon & Schuster knew Argov would not be paid the specified calculation on net receipts for every copy sold or licensed, when it uploaded the Argov book and authorized ProQuest to distribute it.  Defendants set up this one-sided accounting system to serve their interests and the interests of their subscription and lending partners, to unjustly profit at the expense of uncompensated authors such as Argov.

49.     Defendants engaged in unfair, unlawful and deceptive practices and conduct which prevented Argov from protecting her copyright, and from learning the truth about her book sales. When faced with inconvenient questions about why they deviated from the terms of the Publishing Agreements, the Defendants responses demonstrated a pattern of wrongful and extortionate conduct by steadfastly refusing to correct or account for their knowing violations under contract and copyright law.

50.     The Defendants and their distributors collectively devised and agreed on a plan to continue this knowingly wrongful conduct.  In or about May, 2020, Argov learned that Defendants illegally distributed her eBook to Copyright Clearance Center.

51.     On May 4, 2020, Royalties Manager Chris Duffy wrote an email to Argov informing her that Copyright Clearance Center "grants one-time permission to third

parties at a usage rate of $.40 per page with a cap of no more than 10% of the total content of the book employed at one time."

52. When Argov inquired about withdrawing the eBooks that Copyright Clearance Center wrongfully distributed to third parties in an unlicensed manner, Royalties Manager Chris Duffy consulted with other executives and informed Argov via email, "There is no need to issue any type of withdrawal notice."

53. Following each discovery that Argov's work was wrongfully distributed, Argov requested an accounting from Defendants. In response to her inquiry about Copyright Clearance Center, Royalties Manager Chris Duffy consulted with executives at Simon & Schuster and wrote the following in an email to Argov on May 20, 2020:

> "We do not intend to make any further inquiry as to the specifics of who was granted permission or what was copied. The small dollars simply do not warrant the time that would be involved."

54. The statements made to Argov demonstrate the unfair, deceptive and unconscionable conduct towards her by Simon & Schuster. Defendants exploited rights not granted, significantly undercut the royalty owed for every digital copy viewed or downloaded, then refused to provide an accounting, citing "small dollars" collected.

55. As a result of the unauthorized distribution and the Defendant's reckless disregard for Argov's rights, Argov has sent thousands of takedown notices to various domains to remove unauthorized PDF editions of her book. The ongoing infringement of Argov's copyright continues unabated.

56.     As a direct result of Defendants' misconduct as herein alleged, Argov has incurred damages, including punitive and statutory damages.

## REFUSAL TO PROVIDE SALES DATA AND BREACH OF
## THE VERIFICATION OF ACCOUNTING PROVISIONS

57.     Argov met and exceeded her contractual obligations and performed in accordance with the Publishing Agreements by providing services called for under the Agreements.  As a result, all conditions required for Defendant's performance under the Agreements—namely, the payment of money to Argov—have occurred. Adams Media publicly attributes much of its 20-year success to its self-help category of publications and lists Argov's Book as its best-selling property in the company's history.

58.     Defendants are obligated to keep open book accounts reflecting the debits and credits made to Argov.  All balances owed to Argov on said open book accounts for eBooks, including any underpayment, can be determined by examining all the statements Defendants receive from eBook distributors.

59.     Pursuant to the audit provisions Paragraph 9 in the trade paperback contract and Paragraph 18 in the eBook contract, Defendants are required to provide Argov with semi-annual account statements for periods ending June 30th and December 31st.  Argov is entitled under the Publishing Agreements to verify the accountings either independently or through an attorney or auditor on an annual basis.  Defendants deliberately and repeatedly denied Argov access to her accounting records.

60.     In the past several pay periods, Argov experienced an inexplicable and disproportionate decline in royalty payments from the Defendants, which does not correspond to her continued bestselling performance and 15-year track record of royalties paid by the Defendants' predecessor.

61.     Seeking to understand why the royalty payments have been continually

declining, Argov sought access to the sales and royalty data, in industry standard form,

for purposes of determining the validity of the Defendants' royalty calculations. Argov

asked the Defendants to verify the royalty statements from the time of assignment in

2017 through December 31, 2019, requesting third party sales reports and other

documents to verify and back up the disproportionate decline in reported sales by

Defendants.

62.     Defendants omitted to disclose "free" eBooks distributed on the face of

every royalty statement. After providing partial disclosures on the statements that are

misleading and led to additional good faith questions from Argov, Defendants adopted a

policy of refusing to provide Argov with the requested data necessary to determine the

extent of her sales and validity of her royalty statements. The Defendants took evasive

steps to withhold and not disclose third party accounting reports and other material

financial records, royalty statements and other pertinent schedules and reports, to Argov's

detriment.

63.     Defendants receive monthly accountings from Amazon, Apple and

Google, for example, and Defendants are required to pass through 50% to Argov for

profits generated from her eBook.  However, in April of 2020, Royalty Manager Chris

Duffy informed Argov via email that Simon & Schuster executives would not provide her

with sales records from Amazon, Apple and Google, which comprise over 95% of the

paid eBook sales. On April 20, 2020, Royalties Manager Chris Duffy, wrote:

> "You have also requested third-party source information [from Amazon,
> Apple and Google Play] to corroborate the royalty statements which we,
> unfortunately, are unable to provide as we don't have that information.
> Third party information [from Amazon, Apple and Google Play] is

transmitted to us electronically, and there is no physical documentation to share with you. That data would have to come directly to you from Amazon, Apple, and Google as the keepers of the information and to ensure independent third-party corroboration through whatever processes (if any) they have in place."

64.     Defendants repeatedly denied Argov readily-available sales data when she made accounting inquiries, which she is contractually entitled to obtain.  Defendants not only receive these reports monthly, they can retroactively obtain historical sales data from Amazon, Apple or Google, because these companies offer online portals to publishers which display historical sales by title. With a click of button, Defendants can produce verification to Argov for her title.  Despite the fact that Defendants maintain the requested information or could easily gain access to and readily supply it to Argov, and that such information is reasonably necessary for Argov to determine the accuracy of the royalty reporting that—on its face—appears to be erroneous, Defendants adopted a policy of refusing to provide the requested data.  Rather than act in good faith to verify the accountings, Defendants intentionally and willfully concealed third-party reports from Amazon, Google Play, Apple iBooks, ProQuest, and My iLibrary.

65.     Argov has lost royalties and incurred other financial losses and costs due to Defendants' willful wanton and deceptive acts, including, without limitation, improper distribution and active concealment of financial information and reasonable accounting records.  Defendants have also acted with malice, fraud and oppression, entitling Argov to an award of punitive or exemplary damages.

66.     The Defendants' willful breaches, and failure to take appropriate steps to mitigate the infringement after the breaches were discovered have caused irreparable harm to Argov's book sales, and pose a continuing threat to Argov's legal rights and

ability to maximize the value of her copyright.  In addition to monetary, statutory and

punitive damages, Argov seeks appropriate declaratory relief to terminate the Publishing

Agreements (Exhibit A and Exhibit B), by virtue of material breaches by Defendants.

The Publishing Agreements provide Argov a right of termination as follows:

> **Termination**. The rights conveyed under this Agreement shall revert to
> the Proprietor without further notice and without prejudice to any claim
> which the Proprietor may have either for monies due and/or damages
> and/or otherwise in any or all of the following events: . . .
>
>> E.  If the Publisher fails to fulfill or comply with any of the
>> other provisions of this Agreement.

67.     Defendants have damaged Argov's copyright by authorizing the

exploitation of the book by subscription and lending platforms, destroyed the revenue

base from which royalties are calculated, and failed to cooperate with Argov's requests to

verify the accounting. Defendants materially breached the Publishing Agreements, and

Argov is entitled to terminate the Publishing Agreements pursuant to the termination

clauses in the agreements.

## COUNT I
### (Breach of Contract)

68.     Plaintiff repeats each and every allegation contained in the preceding

Paragraphs, as though fully set forth herein.

69.     As set forth above, the Plaintiff has fully performed her duties and

obligations under the two Publishing Agreements attached as Exhibits A and B.

70.     As set forth above, Defendants materially breached the Publishing

Agreements by failing and refusing to perform said obligations and duties, including: (a)

authorizing third-party subscription and lending platforms to exploit the book, (b) failing

to pay the Plaintiff royalties and sums due her, (b) interpreting the Agreements in question in an unreasonable and unfair manner, (c) providing false statements to Plaintiff, and (d) refusing to provide reasonable disclosure of sales and royalty data as necessary to answer questions concerning the validity of their royalty calculations.

71.     As a result of the aforesaid breaches, Plaintiff has suffered damages.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

72.     Plaintiff repeats each and every allegation contained in the preceding Paragraphs, as though fully set forth herein.

73.     As set forth above, the parties entered into two written Publishing Agreements  attached as Exhibits A and B, which contained therein an implied covenant on the part of the parties of good faith and fair dealing.

74.     As set forth above, Defendants breached the implied covenant of good faith and fair dealing implicit to the Publishing Agreements by, among other things: (a) failing to pay the Plaintiff royalties and sums due her, (b) interpreting the Agreements in question in an unreasonable and unfair manner, (c) providing false statements to Plaintiff, and (d) refusing to provide reasonable disclosure of sales and royalty data as necessary to answer questions concerning the validity of its royalty calculations.

75.     As a direct result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages.

## COUNT III
### (Violations of Mass. Gen. Laws Chapter 93A)

76.     Plaintiff repeats each and every allegation contained in the preceding Paragraphs, as though fully set forth herein.

77.     At all times relevant, Defendants were acting in a business context with regard to the Plaintiff and the publishing, marketing, selling and accounting for sales of her book.

78.     As set forth above, Defendants committed unfair and deceptive trade practices that are prohibited under the provisions of Mass. Gen. Laws c. 93A and the regulations of the Attorney General promulgated thereunder.

79.     Defendants acts in this regard were willful and knowing.

80.     As a result, Plaintiff is entitled to recover double or treble her damages, in addition to reasonable attorney's fees, interest and costs.

## COUNT IV
### (Copyright Infringement 17 U.S.C. § 101 et seq.)

81.     Plaintiff repeats each and every allegation contained in the preceding Paragraphs, as though fully set forth herein.

82.     Plaintiff's book that is the subject of the Publishing Agreements contains original, creative, and copyrightable subject matter under the laws of the United States, and Plaintiff's copyrights in her Book are registered with the United States Copyright Office which has issued valid Certificates of Registration for the Book.

83.     By its actions alleged above, Defendants have infringed and will continue to infringe the Plaintiff's copyright in and to the Book by, inter alia, reproducing, distributing, publicly displaying Plaintiff's copyrighted eBook, without any authorization or permission from Plaintiff.  Defendants' acts or omissions, as alleged herein, caused Argov's eBook  to be viewed, loaned, and accessed without authorization from the

copyright owner and without compensation to her.  As a result, the Plaintiff has suffered damages.

84.     Defendant's infringement of Plaintiffs' copyrights, including the Plaintiffs' eBook, is willful and knowing.

85.     Each infringement of the rights of Plaintiff in one of the Books constitutes a separate and distinct act of infringement.

86.     Plaintiff is entitled to any and all remedies for infringement pursuant to the Copyright Act, 17 U.S.C. § 504, including but not limited to statutory damages and/or the gains, profits and advantages obtained by Defendants  based upon the Defendants' willful acts of infringement of her Book.

87.      Plaintiffs are also entitled to recover their attorney's fees and costs, pursuant to 17 U.S.C. § 505.

## COUNT V
### (Secondary Copyright Infringement (17 U.S.C. § 101 et seq.)

88.      Plaintiff repeats each and every allegation contained in the preceding Paragraphs, as though fully set forth herein.

89.     In addition to direct copyright infringement, Defendants are also secondarily liable under theories of contributory liability, inducement liability, and vicarious liability for the unauthorized reproduction, distribution and public display of Plaintiffs' Book.

90.     Defendants are contributorily liable as it knows, or has reason to know, that Plaintiff's Works are infringed each time Plaintiff's Works are uploaded, downloaded, publicly displayed, or viewed in an unauthorized and unlicensed manner, and it has caused and/or materially contributed to those infringements.

91.     Defendant is also secondarily liable for inducement, as Defendants could have but repeatedly declined to take simple measures to prevent further infringement, such as contacting the parties who are distributing the Argov eBook to inform them that the subscription and lending programs should be withdrawn.  Defendants uploaded the eBook file and authorized or facilitated the infringing activity.  Defendants are vicariously liable for copyright infringement because they have the right and ability to supervise the infringement of its partners or sub-licensees and chose to facilitate and willfully allow the infringing activities.

92.     Each infringement of the rights of Plaintiff constitutes a separate and distinct act of infringement.

93.     Plaintiff is entitled to any and all remedies for infringement pursuant to the Copyright Act, 17 U.S.C. § 504, including but not limited to statutory damages and/or the gains, profits and advantages obtained by Defendants  based upon the Defendants' willful acts of infringement of her book.

94.      Plaintiff is also entitled to recover her attorney's fees and costs.

## COUNT VI
### (Declaratory Judgment)

95.     Plaintiff repeats each and every allegation contained in the preceding Paragraphs, as though fully set forth herein.

96.     As set forth above, Plaintiff contends the following:

    A.     That Defendants have acted to violate Plaintiff's copyright and respect to her authored books and works in violation of the Publishing Agreements.

22

B.      That Defendants have acted to violate Plaintiff's right to a complete, proper and accurate accounting of any and all sums due her and payable by Defendants.

C.      Defendant's misconduct, as described herein, is ongoing and continues to his date.

97.     The Publishing Agreements entitle the Plaintiff to terminate the Publishing Agreements pursuant to Paragraph 14 (Exhibit A) and Paragraph 15 (Exhibit B).

98.     A judicial determination and declaration are necessary in order to ascertain the parties' respective rights and duties with regard to the termination.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SHERRY ARGOV respectfully requests:

1.     For actual, statutory, and punitive  damages, plus interest and costs;
2.     For appropriate declaratory and equitable relief;
3.     For termination of the Publishing Agreements;
4.     For an accounting;
5.     For reasonable attorney's fees;
6.     For such other relief as the Court deems just and proper.

Respectfully submitted,

SHERRY ARGOV

By her attorneys,

/s/Edward V. Colbert III

DATE:  7/8/2020

Edward V. Colbert III (BBO#566187)
Casner & Edwards, LLP
303 Congress Street
Boston, MA 02210
Telephone: (617) 426-5900
Fax: (617) 426-8810
Colbert@casneredwards.com

58875.0/804992.1